[No. 56703-9-I.   Division One.   November 6, 2006.]

*In the Matter of the Detention of* JEFFREY ROBINSON,
*Appellant.*

*Susan F. Wilk* and *Nancy P. Collins* (of *Washington Appellate Project*) for appellant.

*Norm Maleng, Prosecuting Attorney,* and *Rod H. Scarr, Deputy,* for respondent.

¶1 COLEMAN, J. — Jeffrey Robinson appeals from an order of commitment as a sexually violent predator. Robinson contends the State presented insufficient evidence that he had committed a "recent overt act." Specifically, Robinson argues (1) the alleged recent overt act did not qualify as "recent" under the statute because it did not occur during the last period in which he was in the community and (2) there was not proof beyond a reasonable doubt that an overt act had occurred. Robinson also contends the trial court erred in denying his motion to exclude evidence of the Screening Scale for Pedophilic Interests (SSPI) because it does not meet the *Frye*[1] test and is inadmissible under ER 402, 403, and 702.

¶2 We hold that the recentness of a "recent overt act" is determined by considering all the surrounding relevant circumstances. We conclude there was sufficient evidence that Robinson committed a recent overt act because a rational trier of fact familiar with Robinson's history and mental condition could conclude beyond a reasonable doubt that he committed a recent overt act when he was discovered in a locked bedroom with a minor. We hold that the SSPI is an actuarial instrument and is admissible under ER 402, 403, and 702.

*FACTS*

¶3 Robinson was convicted in 1993 of rape of a child in the first degree and kidnapping in the first degree. He was sentenced to 102 months in prison and 24 months of community supervision. In August 2001, he was released on

---

[1] *Frye v. United States*, 54 U.S. App. D.C. 46, 293 F. 1013, 1014 (1923).

community supervision. In November 2001, his community supervision was revoked for violation of his conditions of supervision, and he served an additional 57 days in confinement. He was released on community supervision again in January 2002. In November 2002, he was arrested for violating his community supervision conditions by, among other violations, interacting with a minor child, S.K. He was sentenced to 360 days' incarceration. He was released to the community on July 18, 2003. Four days later, on July 22, 2003, he was arrested, and the State filed a petition to commit him as a sexually violent predator.

¶4 At the commitment hearing, the jury heard testimony from S.K.'s mother. She testified that she and Robinson became friends and that she did not know he was a convicted sex offender.[2] He was at her home frequently, regularly interacting with her siblings and daughter. One night, she returned home at about 4 AM and discovered that her bedroom door was locked. She knocked on the door and Robinson answered. She then saw that her daughter was asleep on the bed.

¶5 Robinson also testified about the event. He stated that he went into a bedroom in S.K.'s house and fell asleep on the bed while watching television. He was later awakened by S.K.'s mother's knock at the door. It was then that he noticed S.K. asleep on the bed beside him. According to Robinson's testimony, S.K. had locked the door in order to get away from a family member who was trying to take away her candy.

¶6 The jury heard testimony from Stu Frothingham, a risk management specialist from the Department of Corrections, regarding Robinson's penile plethysmograph (PPG) results. Frothingham administered the PPG test on Robinson, and he testified that Robinson's arousal rate for a compliant male child was 43 percent and his arousal rate for a compliant female child was 40 percent.

---

[2] The notice of violation filed with the Department of Corrections reports that Robinson and S.K.'s mother had frequent contact since June 2002. Robinson's community corrections officer, Eileen Fermanis, testified about the notice of violation.

¶7 The jury also heard testimony from Dr. Charles Lund, a psychologist and certified sex offender treatment provider. Dr. Lund testified that he reviewed Robinson's extensive case file and test results, interviewed him twice in 2003, and interviewed two of his treatment providers and his community contact person. Dr. Lund also testified about Robinson's SSPI score. Dr. Lund stated that he believed Robinson was more likely than not to engage in predatory acts of sexual violence if not confined to a secure facility.

¶8 The jury found the State had proved beyond a reasonable doubt that Robinson was a sexually violent predator. The court ordered Robinson to be committed to the Department of Social and Health Services in a secure facility for control, care, and treatment pursuant to RCW 71.09.060. Robinson appeals. We affirm.

## ANALYSIS

### Recent Overt Act

¶9 Robinson contends that the State failed to prove he committed a recent overt act because a recent overt act must occur during the last time period in which an individual is in the community before the State files a commitment petition. In other words, Robinson argues that under the statute, his commitment must be based on an overt act that occurred during the four days he was last in the community—July 18, 2003, to July 22, 2003. At trial, the State alleged that he committed an overt act during the previous time period in which he was in the community—January 2002 until November 2002.

¶10 The State argues that the relevant time period is "recentness," not the period after Robinson's last release from confinement. In determining recentness, the State argues that it is appropriate to consider the time span in the context of all the surrounding circumstances. We conclude that the State is correct because the language of the statute does not limit recentness to an offender's last release from confinement, and a previous case has inter-

preted "recent overt act" to allow the court to consider the time span in the context of all the surrounding circumstances. Additionally, adopting Robinson's interpretation would allow absurd results, and the cases Robinson relies on do not limit recentness to an offender's last release from confinement.

¶11 RCW 71.09.010 is a civil statute that authorizes the State to involuntarily commit an individual to a secure treatment facility when he is found by a court or jury to be a sexually violent predator. A sexually violent predator is "any person who has been convicted of or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(16). To commit a person as a sexually violent predator, the court or jury must determine beyond a reasonable doubt whether the person is a sexually violent predator. RCW 71.09.060(1).

¶12 The basis for involuntary civil commitment is the person's dangerousness. *In re Pers. Restraint of Young*, 122 Wn.2d 1, 31, 857 P.2d 989 (1993). In *Young*, the court held that when a defendant has been released from confinement since his last sex offense but before commitment proceedings are initiated against him, the State must prove that he committed a recent overt act to establish his current dangerousness. *Young*, 122 Wn.2d at 41-42. Conversely, under *Young*, the State is not required to prove the individual committed a recent overt act if the individual is incarcerated for a sexual offense at the time the State files its petition. *Young*, 122 Wn.2d at 41.

¶13 The legislature subsequently amended the statute to include the recent overt act requirement. LAWS OF 1995, ch. 216, § 3, *codified as* RCW 71.09.030. RCW 71.09.060(1) provides that "[i]f, on the date that the petition is filed, the person was living in the community after release from custody, the state must also prove beyond a reasonable doubt that the person had committed a recent overt act. . . . " Additionally, RCW 71.09.030(5) authorizes the State to file

a petition against "a person who at any time previously has been convicted of a sexually violent offense and has since been released from total confinement and has committed a recent overt act." " 'Recent overt act' means any act or threat that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm in the mind of an objective person who knows of the history and mental condition of the person engaging in the act." RCW 71.09.020(10).

¶14 The language of the statute does not limit recentness to an offender's last release from confinement. RCW 71.09.060(1) provides: "If, on the date that the petition is filed, the person was living in the community after release from custody, the state must also prove beyond a reasonable doubt that the person had committed a recent overt act. . . . " The statute does not define "recent." Dictionary definitions, however, are often helpful in interpreting statutes because the court prefers to give statutory language its common meaning. *Snohomish County Fire Prot. Dist. No. 1 v. Wash. State Boundary Review Bd.*, 121 Wn. App. 73, 79, 87 P.3d 1187 (2004), *aff'd*, 155 Wn.2d 70, 117 P.3d 348 (2005). One dictionary defines "recent" as "of or belonging to the present period or the very near past." WEBSTER'S THIRD NEW INTERNATIONAL DICTIONARY 1894 (1993). Under this definition of "recent," the State is not limited to alleging the defendant committed an overt act during his last release from confinement. This definition allows the State to allege the defendant committed an overt act during a broader time period.

¶15 *In re Detention of Pugh*, 68 Wn. App. 687, 845 P.2d 1034 (1993) directs the court to determine recentness in the context of all the relevant circumstances. In that case, Pugh pleaded guilty to two counts of first degree statutory rape, served over five years in prison, and underwent an additional 270 days involuntary treatment. *Pugh*, 68 Wn. App. at 689-90. The State petitioned for an additional 180 days of involuntary treatment. *Pugh*, 68 Wn. App. at 690. A commissioner granted the State's petition, concluding there

was a substantial likelihood that Pugh would "act out in the future against children, causing them serious physical harm because of his sexual obsessions." *Pugh*, 68 Wn. App. at 690.

¶16 Pugh appealed, arguing that the commissioner's findings of fact did not support the conclusion of law that he posed a substantial likelihood of committing physical harm because the commissioner did not find that Pugh had committed a recent overt act. *Pugh*, 68 Wn. App. at 694.[3] The court, therefore, had to determine the meaning of "recent." *Pugh*, 68 Wn. App. at 694. The court stated, "[T]here is little or no guidance about . . . how recent [an overt act] must be in order to be relevant." *Pugh*, 68 Wn. App. at 694. It adopted a facts and circumstances test for determining whether an act satisfied the recentness requirement. *Pugh*, 68 Wn. App. at 694-95. The court held that in determining whether an overt act satisfies the recentness requirement, it is appropriate to consider the time span in the context of all the surrounding relevant circumstances. *Pugh*, 68 Wn. App. at 695.

¶17 *Pugh* was decided before the "recent overt act" requirement was codified, but it interpreted the same language that was later codified. *Compare Pugh*, 68 Wn. App. at 694 (interpreting the meaning of " 'a substantial risk of physical harm as evidenced by a *recent overt act*' " (quoting *In re Harris*, 98 Wn.2d 276, 284-85, 654 P.2d 109 (1982))), *with* RCW 71.09.060(1) (providing that "[i]f, on the date that the petition is filed, the person was living in the community after release from custody, the state must also prove beyond a reasonable doubt that the person had committed a *recent overt act*" (emphasis added)). Under

---

[3] *Pugh* was decided before *Young*. In *Young*, the court held that the State was not required to prove an individual committed a recent overt act if it filed its petition while the individual was incarcerated. *Young*, 122 Wn.2d at 41-42. Pugh was incarcerated when the State filed its petition for involuntary treatment. *See Pugh*, 68 Wn. App. at 689-90. If *Young* had been decided before *Pugh*, the *Pugh* court would not have needed to determine the meaning of "recent" because the State would not have been required to prove that Pugh committed a recent overt act.

*Pugh*, we must determine recentness by considering all the surrounding relevant circumstances.

¶18 Robinson's interpretation of "recent" would allow for absurd results. Under Robinson's interpretation of "recent overt act," each time the State releases an individual from confinement, it loses its ability to commit that individual based on events that occurred during previous time spent in the community. For example, a convicted sex offender could be released into the community and commit an overt act that goes unreported temporarily. The offender could then quickly have his community supervision revoked for failing to report (or some other technical violation) and be returned to confinement. If the State subsequently releases the individual and later learns of the overt act, it cannot have him committed as a sexually violent predator based on that overt act. The State will have to wait for the individual to commit a new overt act. Due process does not require that the absurd be done before a compelling State interest can be vindicated. *Young*, 122 Wn.2d at 41-42.

¶19 The court reached a similar conclusion in *In re Detention of Henrickson*, 140 Wn.2d 686, 2 P.3d 473 (2000), where Henrickson was convicted of attempted kidnapping in the first degree and communicating with a minor for immoral purposes. *Henrickson*, 140 Wn.2d at 689. The court imposed an exceptional sentence and Henrickson appealed. *Henrickson*, 140 Wn.2d at 689. He was released for three years pending his appeal of the exceptional sentence. *Henrickson*, 140 Wn.2d at 689. A standard range sentence was finally imposed and Henrickson was incarcerated. *Henrickson*, 140 Wn.2d at 689. Before he was released, the State filed a petition to have him committed as a sexually violent predator. *Henrickson*, 140 Wn.2d at 690. The trial court found that the State did not need to prove a recent overt act because Henrickson was incarcerated on the day the petition was filed. *Henrickson*, 140 Wn.2d at 690.

¶20 Henrickson challenged the trial court's finding, claiming that the State was required to plead and prove that he committed a recent overt act during the period of

time that he was in the community pending his appeal. *Henrickson*, 140 Wn.2d at 690, 698. The Supreme Court rejected Henrickson's argument, explaining that requiring the State to prove a recent overt act occurred during the time he was in the community pending his appeal "would lead to absurd results because, in effect, any postarrest supervised release for whatever reason would provide the opportunity to circumvent the distinctions of the statute." *Henrickson*, 140 Wn.2d at 696. Similarly, limiting "recentness" to an individual's most recent stay in the community would allow absurd results because it would preclude the State from pleading overt acts that occurred during an individual's previous stays in the community, no matter how egregious or recent in time.

¶21 Robinson relies on *Young* for his interpretation of "recent overt act," but that case does not hold that a recent overt act must have been committed during the offender's last release from confinement. *Young* was a consolidated appeal by Andre Brigham Young and Vance Russell Cunningham. *Young*, 122 Wn.2d at 1. Robinson analogizes to Cunningham's appeal. Cunningham raped a woman in early 1987 and raped another woman in April 1987. *Young*, 122 Wn.2d at 16-17. He was convicted on two counts of second degree rape, completed his sentence for both crimes, and was released in approximately August 1990. *Young*, 122 Wn.2d at 16-17. The State petitioned to have him committed as a sexually violent predator on December 21, 1990—four and a half months after he completed his sentence and approximately three and a half years since his last rape. *Young*, 122 Wn.2d at 17. The Supreme Court reversed his commitment as a sexually violent predator because the State did not allege a recent overt act in its petition or at trial. *Young*, 122 Wn.2d at 42.

¶22 Robinson argues that in reversing Cunningham's commitment, the *Young* court held that when the State files a petition against an individual living in the community, it must prove that the individual committed an overt act during his most recent stay in the community. *Young*, how-

ever, did not establish a bright-line rule. In Cunningham's petition and at trial, the State did not allege that he had committed a recent overt act. *Young*, 122 Wn.2d at 42. Apparently, the State did not even argue that the two rapes he committed in 1987 were recent overt acts. *See Young*, 122 Wn.2d at 42. The State relied mostly on expert witnesses at trial. *Young*, 122 Wn.2d at 17. The *Young* court, therefore, did not decide whether the State must prove that an individual committed an overt act during his most recent stay in the community if the State files its petition while the individual is living in the community. *Young* instead held that the State must offer evidence of a recent overt act at trial in order to commit an individual as a sexually violent predator. *Young*, 122 Wn.2d at 42.

¶23 Robinson also argues that *In re Detention of Davis*, 109 Wn. App. 734, 37 P.3d 325 (2002) held the State must prove that an individual committed an overt act during his most recent stay in the community if the State files its commitment petition while the individual is living in the community. Like *Young*, *Davis* does not hold that a recent overt act must have been committed during the offender's last release from confinement.

¶24 In *Davis*, the appellant was convicted of first degree child molestation and sentenced to 84 months in prison and two years of community placement. *Davis*, 109 Wn. App. at 737. While on community placement, Davis was arrested and incarcerated for violating his community placement terms by having unauthorized contact with a 15-year-old boy. *Davis*, 109 Wn. App. at 737. While Davis was incarcerated for violating his community placement terms, the State filed a petition to have him committed as a sexually violent predator. *Davis*, 109 Wn. App. at 737. In its petition, the State argued that it was not required to prove Davis committed a recent overt act because he was incarcerated when the petition was filed. *Davis*, 109 Wn. App. at 737. The trial court agreed and ruled that the State did not have to prove Davis committed a recent overt act. *Davis*, 109 Wn. App. at 737. The jury found Davis was a sexually violent

predator and he was civilly committed. *Davis*, 109 Wn. App. at 738.

¶25  The Court of Appeals reversed his commitment and remanded for a new trial, concluding that under the due process clauses of the federal and state constitutions, the State was required to prove beyond a reasonable doubt that Davis had committed a recent overt act. *Davis*, 109 Wn. App. at 743-47. The court pointed out that incarceration for a community placement violation was not equivalent to incarceration for the underlying offense. *Davis*, 109 Wn. App. at 744. The court held that the State must plead and prove a recent overt act when it files a commitment petition against an individual incarcerated for violating community placement conditions that were imposed at sentencing for a sexually violent offense. *Davis*, 109 Wn. App. at 739, 747.

¶26  Robinson states that under *Davis*, "[t]he last period of [a] person's release from incarceration is the relevant time period for determining whether a recent overt act occurred." Reply Br. of Appellant at 3. The *Davis* court, however, was not required to determine how "recent" a recent overt act must be. Like in *Young*, the trial court in *Davis* did not even consider whether Davis had committed a recent overt act because it determined the State was not required to plead and prove a recent overt act. *Davis*, 109 Wn. App. at 737-38. *Davis* does not support Robinson's argument because "recentness" was not an issue in that case.

### Sufficiency of the Evidence

¶27  Robinson contends he was denied due process of law because he was committed as a sexually violent predator in the absence of sufficient evidence. Specifically, Robinson argues there was insufficient evidence that he committed a recent overt act. We conclude there was sufficient evidence because a rational trier of fact with knowledge of Robinson's history and mental condition could conclude beyond a reasonable doubt that he committed a

recent overt act when he was discovered in a locked bedroom with a minor.

¶28 RCW 71.09.020(10) defines a "recent overt act" as "any act or threat that has either caused harm of a sexually violent nature or creates a reasonable apprehension of such harm in the mind of an objective person who knows of the history and mental condition of the person engaging in the act." In a sexually violent predator civil commitment trial, the State must prove each element of the definition of a sexually violent predator beyond a reasonable doubt. RCW 71.09.060(1). On appeal, the evidence is sufficient if, when viewed in a light most favorable to the State, a rational trier of fact could have found the essential elements of the crime beyond a reasonable doubt. *In re Det. of Thorell*, 149 Wn.2d 724, 72 P.3d 708 (2003).

¶29 When the evidence is viewed in a light most favorable to the State, a rational trier of fact could have found beyond a reasonable doubt that Robinson committed a recent overt act when he was discovered locked in a bedroom with a young girl. The jury heard testimony that Robinson had an arousal rate of 40 percent for a compliant female child. It heard Dr. Lund testify that, in his opinion, Robinson was more likely than not to commit more acts of predatory sexual violence. It also heard testimony of Robinson's past sexual offenses. Given this background information on Robinson, the jury could have found beyond a reasonable doubt that Robinson's act of being in a locked bedroom with a young girl created "a reasonable apprehension" of "harm of a sexually violent nature." RCW 71.09.020(10).

*Admissibility of the SSPI under* Frye

¶30 Robinson argues that the SSPI is novel scientific evidence and, therefore, to be admitted into evidence, must meet the standard set forth in *Frye*, 293 F. at 1014. *Thorell*, 149 Wn.2d at 754. The *Frye* test as used in Washington requires a trial court to determine whether a scientific theory or principle has achieved general acceptance in the relevant scientific community before admitting

it into evidence. *Thorell*, 149 Wn.2d at 754. The State argues that the SSPI is an actuarial instrument and therefore not novel and not subject to a *Frye* hearing under *Thorell*. We agree.

¶31 In *Thorell*, the court considered whether actuarial instruments should be viewed as novel scientific evidence and therefore subject to the *Frye* test. *Thorell*, 149 Wn.2d at 754. The *Thorell* court first compared actuarial approaches with clinical approaches to predicting recidivism. *Thorell*, 149 Wn.2d at 753. In the clinical approach, evaluators consider a wide range of risk factors and then form an overall opinion concerning future dangerousness. *Thorell*, 149 Wn.2d at 753. In contrast, "[t]he actuarial approach evaluates a limited set of predictors and then combines these variables using a predetermined, numerical weighting system to determine future risk of reoffense which may be adjusted (or not) by expert evaluators considering potentially important factors not included in the actuarial measure." *Thorell*, 149 Wn.2d at 753.

¶32 The court agreed with the State that the methods and procedures used to construct actuarial instruments are well accepted in the scientific community. *Thorell*, 149 Wn.2d at 754. It held that trial courts need not conduct a *Frye* hearing for the admission of actuarial instruments because they are not novel scientific evidence. *Thorell*, 149 Wn.2d at 755. Opposition to the evidence of actuarial instruments "went to the weight of the evidence rather than its admissibility." *Thorell*, 149 Wn.2d at 756.

¶33 The SSPI measures sexual attraction to prepubescent children based on victim characteristics. Both Robinson and the State rely on an article about the SSPI written by its developers: Michael C. Seto, Grant T. Harris, Marnie E. Rice & Howard E. Barbaree, *The Screening Scale for Pedophilic Interests Predicts Recidivism Among Adult Sex Offenders With Child Victims*, 33 ARCHIVES OF SEXUAL BEHAV. 455 (Oct. 2004).

¶34 Using the SSPI, an evaluator examines an adult sex offender's past offenses for four victim characteristics: (1)

more than one victim, (2) male victim, (3) extra-familial victim, and (4) prepubescent victim. *See* Seto et al., *supra*, at 456; Report of Proceedings (RP) (July 19, 2005) at 44. The offender's score is increased for every characteristic present. The higher the score, the higher the offender's pedophilic interests. RP (July 19, 2005) at 44. SSPI results have been compared to phallometric results and reconviction data. *See* Seto et al., *supra*, at 456-64; RP (July 19, 2005) at 44. These comparisons show that the SSPI is an accurate tool for evaluating risk of recidivism. Seto et al., *supra*, at 464; RP (July 19, 2005) at 44.

¶35 Under *Thorell*, SSPI is an actuarial approach to determining an individual's level of future dangerousness. An actuarial approach evaluates a limited set of predictors and then combines them using a predetermined numerical weighting system to determine risk of recidivism. *Thorell*, 149 Wn.2d at 753. The SSPI is an actuarial approach to determining recidivism because it evaluates a limited set of predictors (victim characteristics) and combines them using a numerical weighting system to determine pedophilic interests and likelihood of recidivism. *See* Seto et al., *supra*, at 455-56, 464; RP (July 19, 2005) at 44.

¶36 Robinson's expert witness stated that the SSPI is an actuarial instrument, but he was concerned that a small sample was used in its development. RP (July 25, 2005) at 84. The SSPI is based on items similar to the items used in the Rapid Risk Assessment for Sexual Offense Recidivism and other actuarial instruments. Seto et al., *supra*, at 456; *see Thorell*, 149 Wn.2d at 753-58 (affirming *In re Det. of Strauss*, 106 Wn. App. 1, 20 P.3d 1022 (2001), which held the Rapid Risk Assessment for Sexual Offense Recidivism admissible under *Frye* as an actuarial instrument). As an actuarial instrument, SSPI does not need an independent evidentiary analysis under *Frye*. *Thorell*, 149 Wn.2d at 755.

### *Admissibility of SSPI under ER 402 and 403*

¶37 Robinson also argues that the SSPI evidence should not have been admitted either because it is not

relevant under ER 402 or, in the alternative, because its probative value is substantially outweighed by its prejudicial value under ER 403. We conclude that the SSPI evidence is relevant under ER 402 and that its probative value is not substantially outweighed by the danger of unfair prejudice under ER 403.

¶38 The SSPI evidence is relevant under ER 402 because it is an accurate tool for evaluating risk of recidivism. ER 402 provides, "All relevant evidence is admissible . . . . Evidence which is not relevant is not admissible." The Seto study found that the SSPI had predictive value in determining a sex offender's risk of recidivism. *See* Seto et al., *supra*, at 464. SSPI is therefore relevant because Robinson's hearing was to determine his future dangerousness.

¶39 The SSPI's probative value is not substantially outweighed by the danger of unfair prejudice under ER 403. ER 403 provides, "Although relevant, evidence may be excluded if its probative value is substantially outweighed by the danger of unfair prejudice . . . ." In *Thorell*, the court considered the admissibility of testimony regarding future dangerousness. *Thorell*, 149 Wn.2d at 758. The court stated that "[t]estimony regarding the future dangerousness of SVPs [sexually violent predators], by its nature, is prejudicial." *Thorell*, 149 Wn.2d at 758. The court found, however, that danger of prejudice did not substantially outweigh the evidence's probative value because "the likelihood of continued violence on the part of these individuals was central to the determination of whether they should be committed under the SVPA [sexually violent predator act]." *Thorell*, 149 Wn.2d at 758. In the same way, evidence of Robinson's likelihood of committing another sexual offense against a minor was central to the determination of whether he should be committed. The probative value of the SSPI evidence is not substantially outweighed by the danger of unfair prejudice.

*Admissibility of the SSPI under ER 702*

¶40 Finally, Robinson argues that the SSPI evidence should not have been admitted because it is not helpful to the trier of fact under ER 702. Specifically, Robinson contends that testimony about the SSPI could not have assisted the trier of fact because there is no formula by which an expert can use the SSPI score to calculate a projected PPG reading or percentage of risk of recidivism.

██ ██ ¶41 The SSPI evidence was properly admitted under ER 702 because expert testimony on Robinson's SSPI score would help the trier of fact to determine Robinson's future dangerousness. ER 702 provides, "If scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as an expert . . . may testify thereto in the form of an opinion . . . ." Under *Thorell*, " 'actuarial risk assessment instruments may be admissible in evidence in a civil commitment proceeding under the SVPA when such tools are used in the formation of the basis for a testifying expert's opinion concerning the future dangerousness of a sex offender.' " *Thorell*, 149 Wn.2d at 756 (quoting *In re Commitment of R.S.*, 173 N.J. 134, 801 A.2d 219, 221 (2002)). As explained above, the SSPI is an actuarial instrument under *Thorell*. Dr. Lund, a licensed psychologist and certified sex offender treatment provider, used Robinson's SSPI score in forming his opinion on Robinson's future dangerousness. RP (July 19, 2005) at 44. Dr. Lund based his expert opinion regarding Robinson's future dangerousness on other actuarial instruments as well: the Minnesota Sex Offender Screening Tool—Revised, the Static-99, and the Rapid Risk of Assessment for Sexual Offense Recidivism. Dr. Lund used Robinson's SSPI score as an aid in forming his opinion on Robinson's future dangerousness, consistent with ER 702 and *Thorell*. Robinson's argument that there is no formula by which an expert can use the SSPI score to calculate a projected PPG reading or

percentage of risk of recidivism goes to the weight of the SSPI evidence and not to its admissibility.

¶42 We affirm.

BECKER and ELLINGTON, JJ., concur.