FILED
COURT OF APPEALS
DIVISION II

2013 JUL 30 AM 10: 29

STATE OF WASHINGTON

BY_____
DEPUTY

# IN THE COURT OF APPEALS OF THE STATE OF WASHINGTON

## DIVISION II

| | |
|---|---|
| In re the Detention of: | No. 42616-1-II |
| CHARLES URLACHER, | |
| Petitioner. | UNPUBLISHED OPINION |

PENOYAR, J. — Charles Urlacher appeals his civil commitment as a sexually violent predator (SVP), arguing that the trial court erred by excluding expert testimony concerning an actuarial instrument and by admitting child pornography images seized from his personal computer. We affirm.

## FACTS

In 1994, the State charged Urlacher with second degree child molestation. Twelve-year-old M.J. reported to law enforcement that Urlacher had forced her to touch his penis while she was at a sleepover at his house. Urlacher pleaded guilty to fourth degree assault for this offense and received a two-year suspended sentence.

In 1999, Urlacher was charged with two counts of first degree child rape, one count of second degree child rape, and one count of first degree child molestation. The victims of these offenses were 11-year-old J.S. and Urlacher's son C.J. Urlacher pleaded guilty to single counts of first and second degree child rape and received a sentence of 240 months.

Shortly before his scheduled release from confinement in 2010, the State filed a petition under chapter 71.09 RCW, seeking Urlacher's civil commitment as an SVP. The State alleged that Urlacher suffers from the mental abnormality of pedophilia and that this condition causes

him to have "serious difficulty controlling his dangerous behavior" and makes him "likely to engage in predatory acts of sexual violence unless confined to a secure facility." Clerk's Papers (CP) at 2.

Before Urlacher's trial began on August 22, 2011, the State moved to exclude testimony from defense expert Dr. Charles Wollert about the MATS-1[1] actuarial instrument under ER 703. The State argued that the MATS-1 test was an example of Dr. Wollert's reliance on his own novel methods, and it cited rulings from other Washington courts that were critical of his methods. In response, the defense submitted declarations from eight experts regarding their use of the MATS-1 to assess the risk of reoffense in civil commitment proceedings. During the pretrial hearing, the State argued that the test had existed for only nine months and that only a handful of defense-oriented evaluators had used it. "[T]hat's a far cry from it being generally accepted in the field." 1 Report of Proceedings (RP) at 61. The defense conceded that the MATS-1 test was relatively new but cited its use by other experts. The trial court tentatively excluded the MATS-1 evidence under ER 703, reasoning that the test is not generally accepted or reasonably relied upon by experts in the field. The court added, however, that the defense could make an offer of proof concerning the use of the MATS-1 test in Urlacher's case when Dr. Wollert testified.

The defense then moved to exclude any child pornography images seized from Urlacher's computer during the investigation of his 1999 offenses. After the State argued that a portion of this evidence was highly probative of Urlacher's risk to reoffend and supported its expert's diagnosis of pedophilia, the trial court denied the motion to exclude "at this point." 1 RP at 130.

---

[1] Multisample Age-Stratified Table of Sexual Recidivism Rates.

The State began its case by playing some of Urlacher's recent deposition testimony for the jury.[2] Urlacher stated during his deposition that he has had 1,000 sexual partners over his lifetime. The State then called the 58-year-old Urlacher as a witness. Urlacher denied molesting M.J. in 1994, explaining that he pleaded guilty to assault to prevent the disclosure of his son's sexual contact with the girl. He explained that when J.S. was visiting his home in 1999, Urlacher masturbated and performed oral sex on him after J.S. discovered Urlacher sunbathing in the nude. Urlacher further admitted that his molestations of C.J. were "numerous and often." 2 RP at 166. He acknowledged 3-4 additional victims and admitted viewing child pornography on his home computer. He stated that there was a chance he would reoffend in the community.

C.J. testified that his father's abuse began with Urlacher showing him pornographic images and evolved into regular incidents of sexual contact. C.J. added that Urlacher took videos and photographs of him in the nude and while masturbating. Urlacher encouraged C.J. and his friends to be sexually intimate with each other while photographing their behavior, and Urlacher sometimes disappeared into the bedroom with C.J.'s friends. Urlacher's abuse of C.J. began when he was 8 years old and continued until C.J. was 14 or 15 years old, when the boy moved to Arizona to live with relatives.

Urlacher's younger son N.U. testified that his father touched him inappropriately after showing him sexually inappropriate images and encouraging him to discuss sex. The molestation ended with Urlacher's arrest.

C.J.'s friend A.K. testified that Urlacher molested him as many as 200 times, starting when A.K. was 13 years old. A.K. described grooming behavior by Urlacher that led to mutual masturbation, oral sex, and Urlacher sodomizing him. Urlacher took photographs and videotapes

---

[2] The complete deposition transcript was eventually published in open court.

3

of A.K. masturbating. A.K. also described "masturbation parties" during which Urlacher would show boys pornography and encourage them to masturbate to ejaculation in front of him. 2 RP at 226.

Detective Randi Goetz testified that after his arrest in 1999, Urlacher admitted molesting his sons and three other victims. The State also called Detective Richard Voce, who testified about executing a search warrant on Urlacher's home and seizing his computer equipment and files. The defense renewed its motion to exclude the admission of any pornography seized, and the State again argued that a representative sampling was admissible because it showed the depth of Urlacher's untreated mental disorder and supported its expert's diagnosis. The trial court admitted 11 images the State had selected, with the understanding that the State's expert would establish their evidentiary value. RP 396. Detective Voce then explained that the 11 images displayed to the jury in two notebooks were representative of the approximately 170 child pornography images seized.

Urlacher's former therapist testified about his participation in the Sex Offender Treatment Program while incarcerated in 2007. Urlacher disclosed a total of eight victims during his treatment but resigned from the program before its completion. The therapist opined that Urlacher "still had the bulk of the work to do" when he quit the program, and she also thought that viewing pornography was a risk factor for Urlacher. 2 RP at 300.

The State then presented the testimony of Dr. Harry Goldberg, a licensed psychologist. Dr. Goldberg opined that Urlacher suffers from pedophilia and that this condition qualifies as a mental abnormality. Urlacher's collection of child pornography confirmed this diagnosis as well as a higher reoffense risk. Dr. Goldberg also testified that Urlacher's mental abnormality causes him to have serious difficulty controlling his sexually violent behavior. Finally, Dr. Goldberg

4

testified that Urlacher's mental abnormality, combined with his narcissistic personality traits, makes him likely to commit sexually violent acts if not confined.

In assessing whether Urlacher was likely to reoffend, Dr. Goldberg applied several actuarial instruments: the Static-99R, the Static-2002R, the Minnesota Sex Offender Screening Tool Revised (MnSOST-R), and the Sex Offender Risk Appraisal Guide (SORAG). These instruments identify a number of risk factors that, when applied to a particular offender, will result in a score that predicts the likelihood that he will be arrested or convicted of a future sexual offense. Dr. Goldberg testified that these actuarial instruments are commonly used in his practice and in the field and that Urlacher's age was accounted for by the Static-99R, the Static-2002R, and the MnSOST-R. Urlacher's scores on the Static-99R and Static-2002R placed him in the low to moderate risk category, and his scores on the MnSOST-R and SORAG placed him in the moderate to high risk category. Viewed as a whole, the actuarial numbers placed Urlacher in the moderate to high risk category to reoffend.

Dr. Goldberg's separate assessment of Urlacher's dynamic risk factors, including his sexual interest in children and his sexual preoccupation in general, indicated that Urlacher's risk was higher than the actuarial information suggested. Dr. Goldberg found no protective factors such as family support or employment to reduce the risk of reoffense. Dr. Goldberg added that Urlacher's possession of child pornography was an aggravating factor in terms of his recidivism risk and opined that Urlacher could not be safely released into the community at this time.

After Dr. Goldberg testified, the trial court denied the motion to strike the previously admitted child pornography images, disagreeing with defense counsel's argument that the evidence was unduly prejudicial. The court based its ruling on Dr. Goldberg's testimony that possessing, downloading, and copying child pornography shows a higher risk to reoffend.

5

Defense witness and fellow inmate Randy Town testified that Urlacher has never tried to access pornography at the Special Commitment Center (SCC) despite its availability. The defense then called Dr. Richard Wollert.

In an offer of proof, Dr. Wollert explained that the MATS-1 is an actuarial instrument he developed that estimates sexual recidivism on the basis of six items from the Static-99 "that are taken within the context of a respondent's age." 5 RP 723-24. Published in November 2010, MATS-1 is the first instrument to definitively show that advancing age is related to a decrease in recidivism across all risk groups. Dr. Wollert has testified in a prior Washington case and in Iowa about the MATS-1 test since its publication. He stated that the New Zealand Department of Corrections was making plans to adopt the test, and he acknowledged testifying two weeks earlier that the MATS-1 was becoming commonly used. Dr. Wollert stated that time was the only reason that the test was not generally accepted in the field. He testified that he knew of several individuals using the MATS-1 instrument, all of whom were members of the Sex Offender Criminal Defense Association (SOCDA). After hearing argument on the matter, the trial court excluded any reference to the MATS-I test, ruling that the science had not evolved to the point where the MATS-1 was generally relied on by the relevant scientific community and commonly used.

Dr. Wollert then testified that Urlacher had benefited from his participation in sex offender treatment because he now takes responsibility for his offenses and feels remorse for his actions. Dr. Wollert does not believe that Urlacher meets the criteria of a pedophile or that he has a mental abnormality that would make him unable to control his behavior. He believes that Urlacher's prior offenses resulted not from an inability to control his behavior but from a choice to act on his sexual attraction toward children. Because Urlacher is sexually attracted to adults

as well as children, Dr. Wollert found him less predisposed to offend against children in the future, and Dr. Wollert cited studies showing no connection between the possession of child pornography and the risk of reoffense.

Dr. Wollert assessed Urlacher using the Static-99R and Static-2002R actuarial instruments and, like Dr. Goldberg, found that Urlacher was in the low to moderate risk category based on those tests. Other factors supporting a low reoffense risk included Urlacher's age when he began to offend, his victims' presence within the "closed system" of his private home that was now broken, the benefit he had obtained from treatment, his years in prison, and his acceptance of his homosexuality. 5 RP at 791.

The jury returned a verdict finding that Urlacher is a sexually violent predator, and the trial court ordered his commitment at the SCC. Urlacher appeals, arguing that the trial court erred by excluding Dr. Wollert's testimony about the MATS-1 actuarial instrument and by admitting the 11 child pornography images.

## ANALYSIS

I. EXPERT TESTIMONY AND THE MATS-1 ACTUARIAL INSTRUMENT

Urlacher contends that the trial court erred by excluding Dr. Wollert's testimony about the MATS-1 test under ER 703. The State responds that this evidence was properly excluded under ER 702 and ER 703. *See LaMon v. Butler*, 112 Wn.2d 193, 200-01, 770 P.2d 1027 (1989) (appellate court may affirm trial court on any basis the record supports). We review the trial court's exclusion of this testimony to determine whether that exclusion was manifestly unreasonable or based on untenable grounds or reasons. *State v. Roberts*, 142 Wn.2d 471, 520, 14 P.3d 713 (2000); *State ex rel. Carroll v. Junker*, 79 Wn.2d 12, 26, 482 P.2d 775 (1971). Our

7

analysis of this issue is controlled by our recent decision in *In re Detention of McGary*, No. 42552-1-II.

To involuntarily commit a person under chapter 71.09 RCW, the State must prove beyond a reasonable doubt that the person is an SVP. *In re Det. of Fair*, 167 Wn.2d 357, 363, 219 P.3d 89 (2009) (citing RCW 71.09.060(1)). An SVP is "any person who has been convicted or charged with a crime of sexual violence and who suffers from a mental abnormality or personality disorder which makes the person likely to engage in predatory acts of sexual violence if not confined in a secure facility." RCW 71.09.020(18).

Actuarial instruments are often used in SVP trials to aid in the prediction of an offender's future dangerousness. *See, e.g., In re Det. of Thorell*, 149 Wn.2d 724, 753, 72 P.3d 708 (2003); *In re Det. of Robinson*, 135 Wn. App. 772, 786, 146 P.3d 451 (2006). As the Supreme Court explained in *Thorell*,

> The actuarial approach evaluates a limited set of predictors and then combines these variables using a predetermined, numerical weighting system to determine future risk of reoffense which may be adjusted (or not) by expert evaluators considering potentially important factors not included in the actuarial measure.

149 Wn.2d at 753.

Actuarial instruments are not novel scientific evidence requiring a *Frye* hearing and de novo review. *Thorell*, 149 Wn.2d at 755; *see Frye v. United States*, 293 F. 1013, 1014 (D.C. Cir. 1923) (standard for admitting novel scientific theory or principle is whether it has achieved general acceptance in the relevant scientific community). Rather, actuarial instruments are analyzed as an aid to expert testimony under ER 702 and ER 703. *Thorell*, 149 Wn.2d at 755-56.

ER 702 provides that "[i]f scientific, technical, or other specialized knowledge will assist the trier of fact to understand the evidence or to determine a fact in issue, a witness qualified as

an expert by knowledge, skill, experience, training, or education, may testify thereto in the form of an opinion or otherwise." To admit expert testimony under ER 702, the trial court must determine that the witness qualifies as an expert and that the testimony will assist the trier of fact. *Lakey v. Puget Sound Energy, Inc.*, 176 Wn.2d 909, 918, 296 P.3d 860 (2013).[3]

The *Lakey* court compared the tests for admissibility under ER 702 and *Frye*: "*Frye* excludes testimony based on novel scientific methodology until a scientific consensus decides the methodology is reliable; ER 702 excludes testimony where the expert fails to adhere to that reliable methodology." 176 Wn.2d at 918-19. Unreliable testimony does not assist the trier of fact and is properly excluded under ER 702. *Lakey*, 176 Wn.2d at 919.

The trial court may consider questions related to reliability under the "helpful[ness] to the jury" standard of admissibility. *State v. Copeland*, 130 Wn.2d 244, 270, 922 P.2d 1304 (1996). The trial court's conclusions regarding helpfulness will depend on its evaluation of the state of knowledge presently existing about the subject of the proposed testimony and its appraisal of the facts of the case. *State v. Riker*, 123 Wn.2d 351, 364, 869 P.2d 43 (1994). The trial court has broad discretion in determining whether an expert's testimony is admissible under ER 702. *Philippides v. Bernard*, 151 Wn.2d 376, 393, 88 P.3d 939 (2004); *State v. Rafay*, 168 Wn. App. 734, 783, 285 P.3d 83, *review denied*, 176 Wn.2d 1023 (2012).

---

[3] There is some disagreement in Washington cases concerning the proper standard to apply under ER 702. Some courts apply the two-part test set forth in *Lakey*, while others apply a three-part test that includes a consideration of whether the expert testimony is generally accepted in the scientific community. *See, e.g., State v. Cheatam*, 150 Wn.2d 626, 645, 81 P.3d 830 (2003); *State v. McPherson*, 111 Wn. App. 747, 761, 46 P.3d 284 (2002). The "general acceptance" consideration is clearly based on *Frye*. *State v. Cauthron*, 120 Wn.2d 879, 890 n.4, 846 P.2d 502 (1993). Given the *Thorell* holding that the *Frye* standard does not apply to the admissibility of actuarial instruments and the *Lakey* explanation of the differences between the *Frye* test and the two-part test for admissibility under ER 702, we apply the two-part test set forth in *Lakey*.

ER 703 provides that "[t]he facts or data in the particular case upon which an expert bases an opinion or inference may be those perceived by or made known to the expert at or before the hearing." If those facts or data are of "a type reasonably relied upon by experts in the particular field in forming opinions or inferences upon the subject," those facts or data need not be admissible in evidence. ER 703. Because ER 703 is concerned with the trustworthiness of the resulting opinion, the trial court should not allow the opinion if the expert can show only that he customarily relies on such material and if the data are relied on only in preparing for litigation. *State v. Nation*, 110 Wn. App. 651, 663, 41 P.3d 1204 (2002). "The proponent of the testimony must show that experts in the witness's field, in general, reasonably rely upon such material in their own work; i.e., for purposes other than litigation." 5D KARL B. TEGLAND, COURTROOM HANDBOOK ON WASHINGTON EVIDENCE, Rule 703 at 391 (2012-13 ed.). The word "reasonably" in ER 703 gives trial courts discretion in determining whether the underlying information is sufficiently reliable to form the basis of an expert's opinion. 5B KARL B. TEGLAND, WASHINGTON PRACTICE: EVIDENCE LAW AND PRACTICE, §703.1 at 226 (5th ed. 2007).

Dr. Wollert's status as an expert is not at issue here. The question is whether his MATS-1 test is based on a reliable methodology that is generally relied upon by experts in his field. In *Lakey*, the Supreme Court upheld the exclusion of expert testimony under ER 702 because the expert failed to follow reliable methodology. 176 Wn.2d at 919. The trial court's exclusion of Dr. Wollert's proposed testimony was proper for the same reason. Dr. Wollert took an established actuarial instrument, the Static-99, and modified it in a manner that has been applied by relatively few others and by no one outside the defense bar. Dr. Wollert testified that it was only a matter of time before the test was widely accepted but that to date, six experts had applied

his test. The defense supplied declarations from only eight experts who have used the test to evaluate individuals facing civil commitment as sexually violent predators.

There are no state or federal appellate court decisions referring to the MATS-1 test.[4] A New York trial court recently observed that while the MATS-1 may "end up becoming the gold standard for actuarial risk assessment instruments," the MATS-1 cannot currently be relied on to predict sex offender risk because it is the subject of ongoing research, is not commonly used and accepted, and was derived from the Static-99, which is "the most commonly used actuarial risk assessment instrument in use in the world today." *State v. Suggs*, 32 Misc. 3d 1206(A), 932 N.Y.S.2d 763, 2011 WL 2586413, *22 (Sup. Ct.) (unpublished opinion).

The trial court was well aware of the limited state of knowledge concerning the MATS-1 test. The trial court's decision to exclude Dr. Wollert's testimony about the MATS-1 actuarial instrument was not manifestly unreasonable under ER 702. *See Cheatam*, 150 Wn.2d at 652 (even where the relevance and helpfulness of expert witness testimony is debatable, there is no error if the decision to exclude is based on tenable grounds). The trial court's decision to exclude Dr. Wollert's opinion also was reasonable under ER 703 because the opinion was based on the MATS-1 test which the trial court found was not reasonably relied upon by experts generally and thus was not sufficiently reliable to support Dr. Wollert's opinion about Urlacher's risk of recidivism.

---

[4] On appeal, Urlacher cites two opinions from a single federal district court that cite the MATS-1 test without discussion. *United States v. Heyer*, 879 F. Supp. 2d 487, 491 (E.D.N.C. 2012); *United States v. Johnson*, 856 F. Supp. 2d 768, 772 (E.D.N.C. 2012), *aff'd*, ___ Fed. Appx. ___, 2013 WL 2631697 (4th Cir. June 13, 2013). These decisions were not filed until after the trial court made its ruling so cannot support the conclusion that its ruling was manifestly unreasonable.

We add briefly that even if the trial court did err by excluding the MATS-1 evidence, Urlacher cannot show the necessary prejudice. Dr. Wollert never testified about Urlacher's risk of recidivism under the MATS-1 test or about how the results of that test would differ from those of the other actuarial instruments used to assess Urlacher's reoffense risk. Indeed, Dr. Wollert testified that the other actuarial instruments would do as well as the MATS-1 test in assessing Urlacher's risk in relationship to his age. Consequently, any error in excluding his testimony about the MATS-1 test was harmless. *See In re Det. of Mines*, 165 Wn. App. 112, 128, 266 P.3d 242 (2011) (evidentiary error is harmless unless it was reasonably probable that it changed the trial's outcome), *review denied*, 173 Wn.2d 1032 (2012).

## II.   CHILD PORNOGRAPHY IMAGES

Urlacher argues next that the trial court erred by admitting 11 child pornography images seized from his home computer. Here again, we must determine whether the trial court's admission of this evidence was manifestly unreasonable or based on untenable grounds or reasons. *State v. Magers*, 164 Wn.2d 174, 181, 189 P.3d 126 (2008); *State ex rel. Carroll*, 79 Wn.2d at 26.

Prior sexual history is highly probative of an individual's propensity for future sexual violence. *Mines*, 165 Wn. App. at 128. Consequently, even unadjudicated offenses are relevant to the individual's risk to the community if not confined. *Mines*, 165 Wn. App. at 128. Urlacher acknowledges that the images of child pornography seized from his home computer had probative value, as Dr. Goldberg cited them to support his pedophilia diagnosis and the State used them to support its burden of proof. Urlacher argues, however, that the prejudicial effect of these images exceeded their probative value and that they should have been excluded under ER 403.

Rule 403 is considered an extraordinary remedy, and the burden is on the party seeking to exclude the evidence to show that the probative value is substantially outweighed by the undesirable characteristics. 5D KARL B. TEGLAND, SUPRA, Rule 403 at 235 (2012-13 ed); *see also United States v. Dodds*, 347 F.3d 893, 897-99 (11th Cir. 2003) (citing this standard in rejecting the argument that admitting 66 of 3,400 child pornography images found in the defendant's possession was unfairly cumulative and prejudicial in his prosecution for possessing child pornography). The ability of the danger of unfair prejudice to substantially outweigh the probative force of evidence is "'quite slim'" where the evidence is undeniably probative of a central issue in the case. *Carson v. Fine*, 123 Wn.2d 206, 224, 867 P.2d 610 (1994) (quoting *United States v. 0.161 Acres of Land*, 837 F.2d 1036, 1041 (11th Cir. 1988)). Accurate but graphic photographs are admissible even when repulsive if their probative value outweighs their prejudicial effect. *Carson*, 123 Wn.2d at 224.

A Kansas appellate court recently upheld the admission of child pornography seized from an offender's computer in an SVP trial. *In re Care and Treatment of Palmer*, 265 P.3d 565, 573 (Kan. App. 2011), *review denied* (2013). The trial court acknowledged the prejudicial impact of the child pornography images and admitted only a "sampling" that jurors could look at or pass along, but the offender argued on appeal that those images were not relevant to prove the required elements of an SVP petition and were unduly prejudicial. *Palmer*, 265 P.3d at 574.

The Court of Appeals disagreed and held that the images were relevant to a pattern of behavior and appropriate in aiding the jury in determining whether the offender would commit a similar offense again. *Palmer*, 265 P.3d at 574. The images also were relevant to the expert's diagnosis as well as his ultimate opinion concerning the offender's status as a sexually violent predator. *Palmer*, 265 P.3d at 574. Consequently, the Court of Appeals upheld the trial court's

conclusion that the probative value of these images outweighed their highly prejudicial nature. *Palmer*, 265 P.3d at 574.

As the First Circuit explained in upholding the admission of similar images, "The trial court's job is to avoid unfair prejudice. The court is not required to scrub the trial clean of all evidence that may have an emotional impact, where the evidence is "'part of the Government's narrative.'" *United States v. Morales-Aldahondo*, 524 F.3d 115, 120 (1st Cir. 2008) (quoting *United States v. Dean*, 135 F. Supp. 2d 207, 209-10 (D. Me. 2001)). Here, the 11 images were part of the State's narrative, as they supported its expert's opinion regarding Urlacher's future dangerousness and the State's burden of proving his mental disorder. These images were displayed to the jury in two notebooks to be looked at and passed along. In the context of this trial and the other evidence admitted, the 11 child pornography images were not unduly prejudicial and were admissible under ER 403.

Affirmed.

A majority of the panel having determined that this opinion will not be printed in the Washington Appellate Reports, but will be filed for public record in accordance with RCW 2.06.040, it is so ordered.

Penoyar, J.

We concur:

Hunt, J.

Bjorgen, J.

14